UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

CHRISTOPHER DINEAA BAHTUOH,                    Case No. 14-CV-5009 (DSD/JJK)

                    Petitioner,

v.                                             REPORT AND RECOMMENDATION

MICHELLE SMITH, Warden,

                    Respondent.

---

Frederick J. Goetz, GOETZ & ECKLAND PA, for petitioner Christopher Dineaa Bahtuoh.

Elizabeth Roosevelt Johnston, HENNEPIN COUNTY ATTORNEY'S OFFICE, for respondent.

After a jury trial, petitioner Christopher Dineaa Bahtuoh was convicted of first-degree felony murder after participating in a drive-by shooting for the benefit of a gang.   *See* Minn. Stat. § 609.185(a)(3).   On appeal, the Minnesota Supreme Court affirmed both the conviction and the trial court's denial of Bahtuoh's petition for post-conviction relief.   This matter is now before the Court on Bahtuoh's petition for a writ of habeas corpus, brought pursuant to 28 U.S.C. § 2254.   The petition has been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.   For the reasons provided below, this Court recommends that Bahtuoh's habeas petition be denied.

## I.  BACKGROUND

### A.  *The State Court Proceedings*

The Minnesota Supreme Court succinctly summarized the underlying facts of this case as follows:

On the evening of April 28, 2009, Kyle Parker was at his mother's home in Minneapolis with two other men from his neighborhood, A.M. and N.A.   While the three men were outside, Bahtuoh drove past the home, turned his car around, and then drove toward them. Bahtuoh, who knew Parker, opened a car window and called for Parker.   As Parker approached the car, Bahtuoh's passenger — later identified as Lamont McGee — shot Parker multiple times. Bahtuoh then drove away, speeding through a stop sign.   After Parker's sister learned of the shooting, she ran to Parker.   Parker told her that Bahtuoh was responsible for the shooting.   Parker died later that evening from the gunshot wounds.

Bahtuoh and his attorney met with the police approximately 6 weeks later.   Bahtuoh waived his right to remain silent and denied any involvement in the shooting.   The next day, the State charged Bahtuoh by complaint with intentional second-degree murder.   Bahtuoh admitted during a second conversation with the police that he was present at the scene of the shooting, drove the car, and fled the scene.   Bahtuoh testified before a grand jury, which indicted him on four counts of first-degree murder, including first-degree felony murder while committing a drive-by shooting for the benefit of a gang, and two counts of second-degree murder.   On all six counts, the indictment charged Bahtuoh as both a principal and an accomplice.

At the jury trial that followed, defense counsel repeatedly told the jury during his opening statement that Bahtuoh would testify. Nevertheless, Bahtuoh later waived his right to testify and presented no witnesses in his defense.   The jury found Bahtuoh not guilty of two of the counts of first-degree murder, but guilty of the four remaining counts of the indictment.   The district court convicted Bahtuoh of each of the four counts on which the jury found him guilty, but sentenced him only on the count of first-degree felony murder while committing a drive-by shooting for the benefit of a gang.   The district court sentenced Bahtuoh to life imprisonment with the possibility of release after 31 years.

*State v. Bahtuoh*, 840 N.W.2d 804, 808 (Minn. 2013) (citations omitted).

Bahtuoh appealed his conviction to the Minnesota Supreme Court,[1] but the appeal was stayed so that Bahtuoh could file a petition for post-conviction relief before the trial court under Minn. Stat. § 590.01.   In his post-conviction petition, Bahtuoh argued (1) that his defense counsel had provided constitutionally deficient assistance by informing the jury during the opening statement that he would testify at trial, when he did not in fact testify; (2) that his defense counsel had been ineffective in failing to object to an erroneous jury instruction concerning aiding-and-abetting liability under Minnesota law; (3) that the erroneous instruction prejudiced him, as it allowed the jury to find him guilty without finding beyond a reasonable doubt an essential element of the offense of conviction; (4) that the prosecutor committed misconduct by reading, and thereby reinforcing, the erroneous jury instruction during closing arguments; and (5) that his constitutional right to a public trial was violated when trial proceedings were closed during the testimony of one witness.   *See generally* Goetz Aff. Ex. 1 [ECF No. 22-1].   Bahtuoh also requested that the trial court hold an evidentiary hearing on his post-conviction claims.   *See* Minn. Stat. § 590.04.

The district court summarily denied most of Bahtuoh's post-conviction claims for relief, as the files and records from trial conclusively showed that Bahtuoh was not entitled to relief on those claims.   *See* Appendix ("Tr.") at 988-98.[2]   However, the district court elected to hold an

---

[1]Under Minnesota law, "[a] defendant may appeal as of right from the district court to the Supreme Court from a final judgment of conviction of first-degree murder."   Minn. R. Crim. P. 29.02, subd. 1(a).

[2]The appendix in this case — which includes the complete transcripts from Bahtuoh's trial and post-conviction hearing, along with certain state-court filings — is consecutively paginated across three docket entries.   *See* ECF Nos. 14, 14-1, 14-2.   When citing to these entries, this Court refers to the pagination in the bottom-right corner.

evidentiary hearing on a claim that was implied, but not directly articulated, in the

post-conviction petition: whether Bahtuoh's waiver of his right testify had been knowing and

voluntary.   *Id.* at 995-96.   In the trial court's view, Bahtuoh's ineffective-assistance claim

would entirely rise or fall on the question of whether his waiver of the right to testify was

knowing and voluntary.   *Id.* at 996 ("Thus, if Petitioner's waiver of his right to testify was

knowing and voluntary, he was not prejudiced by his attorney's failure to call him as a witness

after he promised to do so during opening statements.").

"At the postconviction evidentiary hearing, Bahtuoh was the only witness who testified."

*Bahtuoh*, 840 N.W.2d at 809.

> Bahtuoh said that he was shocked and confused when, at a meeting
> the night before the State rested its case, defense counsel told
> Bahtuoh that he had decided not to have Bahtuoh testify.   Bahtuoh
> also stated that defense counsel never advised him about the
> advantages and disadvantages of testifying.   According to
> Bahtuoh, defense counsel simply instructed him to say nothing
> other than [that he] understood the questions that [he] was being
> asked when he was questioned about his decision not to testify on
> the record.

*Id.* (quotations omitted); *accord* Tr. 809-58 (transcript from hearing on petition for

post-conviction relief).   Bahtuoh's claim that his waiver of his right to testify was not voluntary

or knowing ultimately was rejected by the trial court, which found that Bahtuoh's testimony at

the hearing was not consistent and therefore not credible and that his allegations were undercut

by his unmistakable acknowledgment at trial that the decision whether to testify was his alone to

make.   Tr. 1003-04.

The district court also went on to find that Bahtuoh's attorney had not provided

ineffective assistance with respect to the decision whether to testify.   Regarding the adequacy of

defense counsel's performance, the trial court found that "Petitioner acknowledged that his attorney came to the jail and spoke to him about the decision to testify or not.   The attorney provided advice.   Petitioner was able to state his concerns about not testifying."   Tr. 1005 (footnote omitted).   The trial court also noted that even if defense counsel's performance had been deficient, there was not a "real and substantial probability that the outcome of the trial would have been different but for the decision not to testify."   Tr. 1006.   The petition for post-conviction relief was therefore denied in full.

The Minnesota Supreme Court consolidated the direct appeal from Bahtuoh's conviction and the appeal from the denial of his petition for post-conviction relief.   Bahtuoh fairly presented seven claims in total before the Minnesota Supreme Court:

First, the Minnesota Supreme Court addressed whether the evidence introduced at trial was sufficient to support Bahtuoh's conviction of first-degree felony murder committed via drive-by shooting for the benefit of a gang.   The focus of the analysis centered on whether the evidence introduced at trial supported a rational inference that Bahtuoh, beyond a reasonable doubt, intentionally aided the shooter and thereby acted as his accomplice.   According to the Minnesota Supreme Court, copious circumstantial evidence about Bahtuoh's state of mind at the time of the murder supported the reasonable inference that Bahtuoh intended to further the commission of the crime.   *Bahtuoh*, 840 N.W.2d at 810-11.   Indeed, the Minnesota Supreme Court went still further in concluding that "there is no rational hypothesis in this case other than Bahtuoh's guilt . . . ."   *Id*. at 811.

Second, the Minnesota Supreme Court considered Bahtuoh's arguments regarding the instructions provided to the jury on the mental state required under Minnesota law for

accomplice liability.   After reviewing the jury instructions as a whole, the Minnesota Supreme

Court concluded that the trial court had, in fact, erred in its instructions regarding accomplice

liability.   *Id*. at 813-14.   Far from the instructions prejudicing Bahtuoh, though, "the jury was

required to find that Bahtuoh had a *more* culpable state of mind than is required for accomplice

liability under Minnesota law."   *Id*. at 814.   The Minnesota Supreme Court declined to address

the related question of whether Bahtuoh's trial counsel had been ineffective in failing to object to

the challenged instructions, as "the jury instructions, considered as a whole, did not constitute

reversible error . . . ."   *Id*. at 816 n.2.

　　　Third, the Minnesota Supreme Court considered whether Bahtuoh knowingly and

voluntarily waived his right to testify at trial.   In considering the claim, the Minnesota Supreme

Court concluded that the district court's factual findings — including specifically and most

importantly the finding that Bahtuoh's testimony at the post-conviction petition hearing was not

credible — were not clearly erroneous.   *Id*. at 815-16.   Because the only evidence supporting

Bahtuoh's claim was testimony that had been rejected by the trial court as not being credible, the

Minnesota Supreme Court concluded that Bahtuoh had not met his burden of proof to show that

his waiver of the right to testify was unknowing or involuntary.   *Id*. at 816.

　　　Fourth, the Minnesota Supreme Court separately considered whether Bahtuoh's trial

counsel was ineffective when he told the jury during his opening statement that Bahtuoh would

testify but then later advised Bahtuoh not to testify.   *Id*. at 816-18.   Just as the trial court had

found, the Minnesota Supreme Court concluded that Bahtuoh failed to show that his counsel's

performance fell below an objective standard of reasonableness.   With respect to the initial

decision to inform the jury that Bahtuoh would testify,

Bahtuoh has not identified any credible evidence indicating that, when defense counsel made his opening statement, he knew or should have known that Bahtuoh was unlikely to testify. Rather, the record suggests that, when defense counsel made his opening statement, defense counsel reasonably expected that Bahtuoh would testify. Because Bahtuoh had previously waived his right to remain silent and spoken both to the police and to the grand jury, and in fact intended to testify at trial, it was reasonable for defense counsel to believe, at the time of his opening statement, that Bahtuoh would testify.

Had Bahtuoh taken the stand, defense counsel's representations in his opening statement would not have prejudiced Bahtuoh and may well have benefited him by explaining to the jury how Bahtuoh's testimony would fit into the defense theory of the case. It is only in hindsight, with the knowledge that Bahtuoh did not testify, that defense counsel's representations in his opening statement appear imprudent. But we have cautioned against relying on hindsight when reviewing decisions made by trial counsel. Although defense counsel took a risk when he told the jury in his opening statement that Bahtuoh would testify — a risk that hindsight shows was unwise — making that representation was not objectively unreasonable at the time.

*Id*. at 817 (citation omitted).

With respect to the later decision to counsel Bahtuoh against testifying, the Minnesota Supreme Court accepted defense counsel's explanation to the jury during closing arguments that allowing Bahtuoh to take the stand would be too risky — "Why would I put a 20-year-old young man up against an experienced prosecutor?" — and that, in his view, the state had failed to prove its case. *Id*. at 817 (quoting Tr. 727). "Thus," concluded the Minnesota Supreme Court, "the record establishes that trial counsel weighed the risks of Bahtuoh testifying against the risks associated with failing to fulfill the representations that he made to the jury during his opening statement. And trial counsel weighed those risks in light of new information — the strength of the State's case — that he did not know at the beginning of trial." *Id*. "On these facts,

-7-

therefore, we cannot say that trial counsel's performance fell below an objective standard of reasonableness."  *Id*.

Fifth, the Minnesota Supreme Court rejected the argument that the trial court erred by refusing to declare a mistrial after the court reporter read into the record a fragment of Bahtuoh's grand-jury testimony that should have been redacted.

> The testimony to which Bahtuoh objected placed him at the scene of another shooting on the same evening as Parker's murder. Specifically, the court reporter read a passage of Bahtuoh's grand-jury testimony in which Bahtuoh discussed an incident that had occurred earlier that evening: "I went to go use the bathroom, I washed my hands, and as I was coming back to the door, a car came around the corner and fired."  Despite the State's intent to redact all references to the earlier incident, it mistakenly failed to redact the reference read by the court reporter.  Once the court reporter read the disputed testimony, the State immediately drew the mistake to the attention of the district court and made additional redactions before the court reporter read the remainder of Bahtuoh's grand-jury testimony.

*Id*. at 819.   The trial court found, and the Minnesota Supreme Court agreed, that there was not a reasonable probability that the outcome of the trial was affected by the error.   The reference was brief — just two words ("and fired") over the course of a 4-day trial — and, the Minnesota Supreme Court concluded, the government's case against Bahtuoh had been strong.  *Id*. at 819-20.

Finally, in a pro se supplemental brief, *see* Tr. 911-13, Bahtuoh raised two claims before the Minnesota Supreme Court that he does not raise in these habeas proceedings, and so this Court will discuss the claims only briefly.   Bahtuoh again alleged that the trial was closed during the testimony of one witness, but that claim was denied because Bahtuoh had not presented evidence to show that the courtroom had, in fact, been closed.   *Bahtuoh*, 840 N.W.2d at 820.

Bahtuoh also argued that the jury's verdict, which acquitted him of two counts of first-degree *premeditated* murder while finding him guilty of *intentionally* aiding the commission of first-degree felony murder, was logically inconsistent.   The Minnesota Supreme Court distinguished between logical inconsistency and legal inconsistency and found that logical inconsistency of the kind alleged by Bahtuoh was not a sufficient basis for a new trial under Minnesota law.   *Id.* at 820-21 (citing, e.g., *State v. Leake*, 699 N.W.2d 312, 325-26 (Minn. 2005)); *accord United States v. Powell*, 469 U.S. 57, 65-67 (1984).

Accordingly, Bahtuoh's conviction was affirmed.

## B.   The Federal Habeas Corpus Proceedings

Bahtuoh then timely filed a petition for a writ of habeas corpus pursuant to § 2254.   The habeas petition purports to raise four grounds for relief, but one of those grounds includes three distinct claims.   Thus, more accurately recharacterized, Bahtuoh's habeas petition presents six bases on which he believes his conviction should be vacated:

·        In Ground One, Bahtuoh argues that the trial court gave a plainly erroneous and prejudicial jury instruction regarding accomplice liability.   *See* Petition at 3-4 [ECF No. 1].

·        Ground Two includes three separate claims for relief based on the conduct of Bahtuoh's attorney: (1) that defense counsel should have objected to the plainly erroneous jury instruction; (2) that defense counsel was ineffective in promising to the jury that Bahtuoh would testify, only to later instruct Bahtuoh not testify; and (3) that counsel's actions amounted to a denial of Bahtuoh's right to testify at trial

— or, put another way, that Bahtuoh's waiver of his right to trial was not knowing and voluntary because of the conduct of his attorney.   *Id*. at 4-5.

·        In Ground Three, Bahtuoh alleges that his right to a fair trial was denied when the court reporter read from a portion of Bahtuoh's grand-jury testimony that should have been redacted.   *Id*. at 6-7.

·        In Ground Four, Bahtuoh challenges the sufficiency of the evidence supporting his conviction.   *Id*. at 7.

At the time he filed his habeas petition, Bahtuoh also moved for appointment of counsel and for an evidentiary hearing.   *See* ECF Nos. 3 & 5.   The Court ordered the government to answer the habeas petition, *see* Rule 5 of the Rules Governing Section 2254 Cases in the United States District Courts, but denied Bahtuoh's motions for appointment of counsel and for an evidentiary hearing without prejudice, *see* ECF No. 11.   After submission of the government's answer, the appendix, and Bahtuoh's reply brief, this Court *sua sponte* appointed attorney Frederick J. Goetz to represent Bahtuoh with respect to the following questions:

1.        The Minnesota Supreme Court found that Bahtuoh's trial counsel's performance was not constitutionally deficient when he told the jury during his opening statement that Bahtuoh would testify at trial and then later advised Bahtuoh not to testify.   Was this finding an unreasonable application of clearly established federal law or based on an unreasonable determination of the facts?

2.        If so, was Bahtuoh prejudiced by his trial counsel's constitutionally deficient performance?

-10-

      3.       Is an evidentiary hearing permitted under 28 U.S.C. § 2254(e)(2) on the above

questions?

      4.       If so, is an evidentiary hearing warranted in this matter?

ECF No. 17 at 1-2.[3]   The parties have submitted supplemental briefing as ordered on these

questions, *see* ECF Nos. 21 & 23, and this matter is now ready for review.

## II. ANALYSIS

### A.   Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") sets forth the

standards that govern this Court's substantive review of Bahtuoh's habeas corpus claims.   The

relevant portion of AEDPA, 28 U.S.C. § 2254(d), provides that:

> An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be
> granted with respect to any claim that was adjudicated on the
> merits in State court proceedings unless the adjudication of the
> claim —
>
> > (1) resulted in a decision that was contrary to, or
> > involved an unreasonable application of, clearly
> > established Federal law, as determined by the
> > Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an
> > unreasonable determination of the facts in light of
> > the evidence presented in the State court
> > proceeding.

---

[3]In their supplemental briefing, the parties agreed that an evidentiary hearing on Bahtuoh's
ineffective-assistance claim is neither permitted nor necessary, as the factual basis for that claim
was fully developed in state court.   *See* ECF No. 21 at 31; ECF No. 23 at 26.

In *Williams v. Taylor*, 529 U.S. 362 (2000), the United States Supreme Court discussed § 2254(d)(1) and how it should be applied by federal district courts.   The Supreme Court recognized that

> a state-court decision can be "contrary to" this Court's clearly established precedent in two ways.   First, a state-court decision is contrary to this Court's precedent if the state court arrives at a conclusion opposite to that reached by this Court on a question of law.   Second, a state-court decision is also contrary to this Court's precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours.

*Id*. at 405.

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."   *Id*. at 413. The Supreme Court also explained that

> [a] federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable. . . .   [A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.   Rather, that application must also be unreasonable.

*Id*. at 409, 411.

A writ of habeas corpus may also be available where the state court's resolution of a prisoner's criminal case is "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."   28 U.S.C. § 2254(d)(2).   In other words, habeas relief can be granted if the conviction is based on findings of fact that could not

reasonably be derived from the state court evidentiary record.   When reviewing a state court

decision, however, "a federal court . . . presumes that the state court's factual determinations are

correct; this presumption may be rebutted only by clear and convincing evidence."   *Lee v.*

*Gammon*, 222 F.3d 441, 442 (8th Cir. 2000).   In addition, 28 U.S.C. § 2254(e)(1) provides that

> [i]n a proceeding instituted by an application for a writ of habeas
> corpus by a person in custody pursuant to the judgment of a State
> court, a determination of a factual issue made by a State court shall
> be presumed to be correct.   The applicant shall have the burden of
> rebutting the presumption of correctness by clear and convincing
> evidence.

Needless to say, a federal district court is not allowed to conduct its own de novo review

of a prisoner's constitutional claims.   *See Yarborough v. Alvarado*, 541 U.S. 652, 665 (2004)

("We cannot grant relief under AEDPA by conducting our own independent inquiry into whether

the state court was correct as a *de novo* matter.").   "AEDPA . . . imposes a highly deferential

standard for evaluating state-court rulings and demands that state-court decisions be given the

benefit of the doubt."   *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citations and quotations

omitted).   Habeas relief cannot be granted unless the petitioner has identified and substantiated a

specific error committed by the state courts.   Moreover, the petitioner must show that the state

courts committed the type of error that is actionable under § 2254(d), as that statute has been

interpreted by the Supreme Court.   Finally, the petitioner "must show that the state court's ruling

on the claim being presented in federal court was so lacking in justification that there was an

error well understood and comprehended in existing law beyond any possibility for fairminded

disagreement."   *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

### B.   Claims for Relief

As explained above, Bahtuoh's habeas petition is framed as raising four grounds for relief, but Bahtuoh in fact presents six distinct claims of error to the Court.   Those claims will be examined in turn, although in a somewhat different order than Bahtuoh presents them in his petition.

### 1.   Validity of Bahtuoh's Waiver of Right to Testify

"A criminal defendant has a constitutional right to testify in his or her own defense." *Frey v. Schuetzle*, 151 F.3d 893, 897 (8th Cir. 1998).   "This right is derived from the Fourteenth Amendment's due process clause, the Sixth Amendment's Compulsory Process Clause, and the Fifth Amendment's prohibition on compelled testimony."   *Id*. (citing *Rock v. Arkansas*, 483 U.S. 44, 51-53 (1987)).   A defendant may waive his right to testify, but only if the waiver is made voluntarily and knowingly.   *See Berkovitz v. Minnesota*, 505 F.3d 827, 828 (8th Cir. 2007) (per curiam).

Bahtuoh did not testify at his trial.   Upon defense counsel notifying the trial court that Bahtuoh did not intend to testify, the following colloquy was conducted among Bahtuoh, his attorney, and the court:

> [Attorney]: Mr. Bahtuoh, this record actually concerns your right to testify or not to testify.   You have a fifth amendment right not to testify, and if you choose to exercise that right not to testify, no one can comment upon that.   I think there is a jury instruction that we are going to request that says the jury shouldn't take that into consideration and probably shouldn't even bring it up in deliberations.   Government has the burden of proof, and that's where it sits.
>
> And the other side of that coin is you can waive your fifth amendment privilege, your right to remain silent, you can waive that and take the stand and testify under oath in your own defense.

-14-

If you decide to do that, and only you can make that decision whether to do it or not, if you do decide to waive your fifth amendment right, you get up on that witness stand over there, and I would ask you questions, you would have to answer those questions under oath and honestly.   And after you and I were done, [the prosecutor] could cross-examine you much like he did at the grand jury.   And you would have to answer his questions truthfully and honestly.

You and I have discussed that right on several occasions, whether you should waive it or not on several occasions, and the pros and cons of doing one or the other, and the fact that that's your right to waive, it's not for me to waive it or not waive it, it's your right. And the courts want the defendant to be apprised of his or her right to remain silent or to waive it and to speak on the record whether they've decided, after talking with their lawyer, they've decided to maintain their right to remain silent, not testify, or on the other side of that coin, to waive that right and to testify.

Have you had enough time to think about whether you would want to testify or remain silent?

[Bahtuoh]: Yes.

[Attorney]: And would you please

state for the record your decision in that regard.

[Bahtuoh]: I will not testify.

[Attorney]: All right.   Do you have any questions of me or even [the trial court] about your right to testify or not?

[Bahtuoh]: No.

[Attorney]: And do you need any more time to consider that?

[Bahtuoh]: No.

> [Attorney]: All right, Mr. Bahtuoh, thank you very much.
>
> Will that suffice, Your Honor?
>
> [Court]: Mr. Bahtuoh, to make it totally clear, this is your absolute right, it's nothing that your attorney decides.   It's your decision. So you understand that?
>
> [Bahtuoh]: Yes.

Tr. 643-45.

While the direct appeal from his conviction was still pending, Bahtuoh filed a petition for post-conviction relief before the trial court alleging, among other things, that his attorney was constitutionally deficient by first informing the jury during the opening statement that he would testify, then later advising him not to testify.   The court interpreted this ineffective-assistance claim as also implying a claim that Bahtuoh did not knowingly and voluntarily waive his right to testify, and the court ordered an evidentiary hearing on the validity of Bahtuoh's waiver.

Bahtuoh testified generally at the post-conviction hearing that he had wanted to testify at his trial, but that his attorney told him that the case had already been won and that it would not be necessary to call him as a witness.   *See* Tr. 820-21.   Bahtuoh also testified that he felt he did not have a choice in the matter of whether to testify, that his attorney had not discussed the pros and cons of testifying versus not testifying, and that his attorney told him to keep his answers during the upcoming colloquy "short and the less I put on the record the better.   Trust me."   Tr. 822.

As accurately explained by the Minnesota Supreme Court, Bahtuoh's claim that his waiver of the right to testify was not knowing or voluntary was denied by the trial court for two reasons:

-16-

First, the court found that Bahtuoh's testimony at the postconviction evidentiary hearing was internally inconsistent. Bahtuoh alternatively testified at the hearing that (1) [he] and his attorney never discussed the advantages and disadvantages of not testifying, (2) [he] and his attorney "went back and forth" about whether to testify, and (3) [he] did not remember whether his attorney explained the advantages and disadvantages of not testifying. Bahtuoh also testified that he felt that he had no choice about whether to testify, which conflicted with his testimony that his attorney never "made" him do anything.

Second, the postconviction court observed that Bahtuoh's postconviction testimony was inconsistent with his statements at the waiver colloquy at trial. During the colloquy at trial, defense counsel explained to Bahtuoh that he had the right to testify, that only he could waive that right, that the jury could not consider his silence in determining guilt, and that if he testified he would be subject to cross-examination. Bahtuoh's response demonstrated that he understood the consequences of waiver and that he nevertheless had made the decision "not [to] testify." To ensure that Bahtuoh understood his rights and that the waiver had not been coerced, the district court then asked Bahtuoh to confirm his decision again on the record: "Mr. Bahtuoh, to make it totally clear, this is your absolute right, it's nothing that your attorney decides. It's your decision. So you understand that?" Bahtuoh responded, "[y]es." At the postconviction hearing, however, Bahtuoh's testimony was different; he said that he did not know "that the decision to testify or not to testify was [his] decision to make" and that he thought that defense counsel "had already made the decision for [him] and . . . it was final."

*Bahtuoh*, 840 N.W.2d at 815-16. Because the only evidence underpinning Bahtuoh's claim was his post-conviction testimony, and because the trial court's finding that the testimony lacked credibility was not clearly erroneous, the Minnesota Supreme Court affirmed the denial of Bahtuoh's claim.

In his habeas petition and accompanying memorandum, Bahtuoh does not argue or even imply that the Minnesota Supreme Court misstated clearly established federal law, or that the

Minnesota Supreme Court's decision "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States . . . ."  28 U.S.C. § 2254(d)(1).   Bahtuoh's claim instead is that, in light of the evidence presented in state court, the findings (1) that his testimony lacked credibility and (2) that he had been counseled by his attorney before making that decision whether to testify were unreasonable.   *See* 28 U.S.C. § 2254(d)(2).[4]   On habeas review, factual findings are presumed to be correct, and the petitioner has the burden of rebutting this presumption of correctness by clear and convincing evidence.   *See* 28 U.S.C. § 2254(e)(1).   "The deference owed to the state trial court pursuant to § 2254(e)(1) includes deference to its credibility determinations."   *Smulls v. Roper*, 535 F.3d 853, 864 (8th Cir. 2008).

One could perhaps quibble with the precise reasoning employed by the trial court in arriving at the factual findings underpinning its conclusion that Bahtuoh had voluntarily and knowingly waived his right to testify.   For example, with respect to the finding that Bahtuoh's post-conviction petition hearing testimony was internally contradictory and therefore not

---

[4]The Eighth Circuit often has noted that the question of whether constitutional rights have been knowingly and voluntarily waived is a mixed question of law and fact.   *See, e.g.*, *Easter v. Norris*, 100 F.3d 523, 525 (8th Cir. 1996) ("Whether a plea is knowing and voluntary is a mixed question of fact and law . . . .").   Here, though, the dispute is entirely factual.   Bahtuoh alleges that he felt the decision whether to testify was out of his control and that he was never adequately counseled on the pluses and minuses of testifying versus not testifying.   If those things are untrue — that is, if Bahtuoh *did* understand that the decision was his alone, and if his attorney *did* discuss with him the ramifications of not testifying — then it follows that Bahtuoh's waiver was knowing and voluntary.   Put another way: Bahtuoh does not contend, and he could not plausibly argue, that finding a valid waiver of the right to testify by a defendant who (1) fully understood he could testify and (2) had been counseled by his attorney about the likely effects of waiving the right to testify is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States . . . ."   28 U.S.C. § 2254(d)(1).

credible, it is true that Bahtuoh testified that he and his attorney "sat there and went over it, went back and forth about it" (Tr. 819) while otherwise denying that his attorney had discussed the pros and cons of testifying.   But those assertions are not *necessarily* incompatible; Bahtuoh's hearing testimony can plausibly be read as indicating that he told his attorney that he wanted to testify, but that defense counsel insisted the trial had already been won and that Bahtuoh should trust him without providing specific advice about why Bahtuoh should or should not testify.

Similarly, with respect to the finding that Bahtuoh's post-conviction petition hearing testimony was undercut by his representations at the trial colloquy, it is certainly true that "representations made by a defendant" in court "carry a strong presumption of verity and pose a 'formidable barrier in any subsequent collateral proceedings.'" *Voytik v. United States*, 778 F.2d 1306, 1308 (8th Cir. 1985) (quoting *Blackledge v. Allison*, 431 U.S. 63, 74 (1977)).   But Bahtuoh's testimony at the colloquy, read *literally*, does not confirm that his waiver of the right to testify was knowing.   The only questions asked of Bahtuoh directly were (1) whether he had enough time to think about his decision; (2) whether he would testify; (3) whether he had any questions for his attorney or the court; and (4) whether he understood that the choice to testify or not to testify was his alone.   *See* Tr. 644-45.   Defense counsel prefaced the first of those questions — "Have you had enough time to think about whether you would want to testify or remain silent?" — with his own declaration that he and Bahtuoh had discussed "on several occasions, whether you should waive it or not on several occasions, and the pros and cons of doing one or the other . . . ."   *Id*. at 644.   But Bahtuoh never verbally confirmed that this was true.   *See id*. at 643-45.

-19-

Nevertheless, this Court cannot conclude that Bahtuoh has rebutted the factual findings of the trial court by clear and convincing evidence.   *See* 28 U.S.C. § 2254(e)(1).   Although Bahtuoh's post-conviction hearing testimony *can* be read as internally consistent, the trial court's conclusion that Bahtuoh had contradicted himself and thereby undercut his own credibility was not an unreasonable interpretation of Bahtuoh's testimony.   Moreover, the trial court — which could witness Bahtuoh's way of speaking and mannerisms first-hand — was far better positioned to weigh Bahtuoh's credibility than this Court.[5]   *Cf. United States v. Vinton*, 631 F.3d 476, 481 (8th Cir. 2011) ("The district court . . . has a 'distinct advantage' in evaluating the credibility of witnesses, and its credibility determinations are 'virtually unreviewable on appeal.'" (quoting *United States v. Ralph*, 480 F.3d 888, 890 (8th Cir. 2007))).   Because Bahtuoh's claim that the waiver was not voluntary or knowing depends entirely upon his post-conviction hearing testimony, a finding that his post-conviction testimony was not credible is virtually fatal to the claim.

Second, even if the colloquy conducted at trial by defense counsel left something to be desired in terms of precision,[6] Bahtuoh did not correct, question, or otherwise speak up when his attorney stated at the colloquy that "[y]ou and I have discussed that right on several occasions, whether you should waive it or not on several occasions, and the pros and cons of doing one or

---

[5]Even on the written page, aspects of Bahtuoh's testimony come across as less than forthright. For example, Bahtuoh steadfastly refused to admit that, for his post-conviction allegations to be true, his answers at the waiver colloquy could not have been wholly honest.   *See* Tr. 843-45.

[6]To be clear, though, a knowing and voluntary waiver of the right to testify can be found without *any* colloquy being done at all.   *See United States v. Ehrmann*, 421 F.3d 774, 783 (8th Cir. 2005); *Frey*, 151 F.3d at 898; *United States v. Yono*, 605 F.3d 425, 426 (6th Cir. 2010); *United States v. Ortiz*, 82 F.3d 1066, 1069-71 & n.8 (D.C. Cir. 1996) (collecting cases).

the other."   Tr. 644.   This silence, in this context, could reasonably be used to support the factual finding of the trial court[7] that Bahtuoh's attorney had offered advice about whether to testify and that Bahtuoh accepted that advice in making his decision.   *See United States v. Bernloehr*, 833 F.2d 749, 751-52 (8th Cir. 1987) ("The defendant may not . . .  indicate at trial his apparent acquiescence in his counsel's advice that he not testify, and then later claim that his will to testify was 'overcome.'").   Bahtuoh has not rebutted this factual finding with clear and convincing evidence, and this finding dooms any claim that Bahtuoh's waiver of the right to testify was not knowing.[8]   Taken together, those factual findings — that Bahtuoh's testimony at his post-conviction petition hearing was not credible, and that defense counsel discussed the pros and cons of testifying with Bahtuoh — compel the finding of law that Bahtuoh's waiver of his right to testify was voluntary, knowing, intelligent, and therefore valid.

And even beyond these particular factual findings of the trial court, there were other circumstances that suggested Bahtuoh's waiver of the right to testify was fully voluntary and knowing.   Bahtuoh expressly and in no uncertain terms confirmed at trial upon questioning from the court that he understood the decision not to testify was his alone.   *See* Tr. 645.   In addition,

_____

[7]*See* Tr. 1005 ("Petitioner acknowledged that his attorney came to the jail and spoke to him about the decision to testify or not.   The attorney provided advice." (footnote omitted)).   Although the Minnesota Supreme Court did not mention this factual finding in its decision, AEDPA's "'presumption of correctness applies to factual determinations made by state courts, whether the court be a trial court or an appellate court.   The statute makes no distinction between the factual determinations of a state trial court and those of a state appellate court.'" *Perry v. Kemna*, 356 F.3d 880, 883 (8th Cir. 2004) (quoting *King v. Bowersox*, 291 F.3d 539, 540 (8th Cir. 2002)).

[8]It also dooms the distinct but related claim — not explicitly raised, but at a minimum suggested — that defense counsel was constitutionally ineffective by *entirely* failing to advise Bahtuoh about whether he should testify.   A *third* related claim — under the circumstances, was Bahtuoh's attorney ineffective by advising Bahtuoh not to testify? — is considered at length below.

Bahtuoh had four times previously waived his right to remain silent (three times when speaking

with police and once before the grand jury), suggesting that he was well aware that the option to

speak was available to him.   *See* Tr. 846.   Taking all those circumstances together, the

conclusion of the Minnesota courts that Bahtuoh's waiver of the right to testify had been

knowing and voluntary was not an unreasonable application of clearly established federal law.

*See, e.g.*, *United States v. Ramirez-Santos*, 456 Fed. App'x 683, 684 (9th Cir. 2011) (per curiam)

(no plain error in trial court finding that the defendant had made a knowing, voluntary, and

intelligent decision not to testify where record established defendant's counsel advised him not to

testify and where trial court engaged in colloquy with defendant concerning the right to testify);

*Marshall v. United States*, 911 F.2d 736 (10th Cir. 1990) (unpublished table disposition).   This

claim should be denied.

> 2.   Ineffective Assistance of Counsel — Bahtuoh's Failure to Testify[9]

During his opening statement, defense counsel insisted repeatedly to the jury that

Bahtuoh would testify:

- "You also know that Mr. Bahtuoh has a right to remain silent.   He will
  waive that right.   He made three statements to the police.   He testified before the
  grand jury under oath.   And he's going to talk to you during the trial.   And he is
  going to tell you the truth." Tr. 24.

---

[9]Nestled into Bahtuoh's memorandum in support of his habeas petition is an inchoate claim that his attorney did not do enough to investigate and establish McGee's role in the shooting.   Pet'r Mem. at 17-18 [ECF No. 6].   However, both the government and Bahtuoh proceeded at trial on the theory that McGee shot Kyle Parker.   Apart from arguing that his attorney should have requested a continuance of the trial (towards what end is unclear), Bahtuoh does not suggest what more his attorney should have done regarding McGee or what a further investigation by the attorney would have uncovered.   This claim is not adequately developed and, by all appearances, is without merit.

- "Mr. Bahtuoh will tell you how Lamont McGee came to get into his car, and why Mr. Bahtuoh had a good reason to believe that Lamont McGee was not armed that day."   Tr. 26.

- "I would ask you to keep an open mind, to continue to presume Mr. Bahtuoh innocent, wait for the whole trial to unfold before you.   Wait until he takes the stand and tells you what happened."   Tr. 32.

In anticipation of Bahtuoh's testimony and subsequent impeachment on the stand, defense counsel went so far as to preemptively disclose during his opening statement that Bahtuoh had previously been convicted for aggravated robbery, *see* Tr. 25 ("he'll tell you about that as well"), even though that information would not have been admissible if Bahtuoh did not testify, *see* Minn. R. Evid. 404(b), 609.

Notwithstanding these unambiguous and repeated assertions in the opening statement, defense counsel later advised Bahtuoh not to testify upon the government concluding its case. Defense counsel addressed the jury during his closing argument about why Bahtuoh did not testify:

> One of the things I want to get straight right away is that Mr. Bahtuoh did not take the stand.   I told you he would.   That's my fault.   However, why should I put him on the stand?   Why should I?   When they didn't prove their case and you got his grand jury testimony read to you, which he gave under oath, read to you, which exonerates him.   Why would I put a 20-year-old young man up against an experienced prosecutor?   I'm not going to do that. Because when you start doing that, you may start weighing, well, we don't like his mannerisms, we don't like him.   We don't like the way he sat in the chair.   Any number of things you could — you start taking the burden of proof away from the government and putting it on the defense.   There was no need to put him on the stand because the government didn't prove their case and his truthful story came across in his grand jury testimony. . . . And as I said before, trials are live, they're not rehearsed.

*Bahtuoh*, 840 N.W.2d at 817 (quoting Tr. 727-28); *see also* Tr. 723-24 ("I haven't taken a lot of

your time during this case.   I haven't had to.   I haven't had to because the government never

proved the case that I had really to defend.").

Bahtuoh argued before the Minnesota Supreme Court that his counsel provided

ineffective assistance with respect to his advice about whether to testify.   The claim was rejected

because, in the Minnesota Supreme Court's view, "counsel's performance did not fall below an

objective standard of reasonableness . . . ."   *Bahtuoh*, 840 N.W.2d at 818.   Bahtuoh renews his

ineffective-assistance claim in these habeas proceedings.

To prevail on a claim of ineffective assistance of counsel, a claimant must show that his

counsel's performance fell below an objective standard of reasonableness, *see Strickland*, 466

U.S. at 687-88, and that there is a reasonable probability that, but for his counsel's errors, the

result of his proceeding would have been different, *id*. at 694.   "The first prong requires a

showing that counsel made errors so serious that counsel was not functioning as the counsel

guaranteed the defendant by the Sixth Amendment."   *White v. Dingle*, 757 F.3d 750, 752

(8th Cir. 2014) (quotations omitted).   "The second prong requires a showing that there is a

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different."   *Id*. at 753 (quotations omitted).   The claimant bears the burden of

establishing both *Strickland* prongs.   *Thomas v. United States*, 737 F.3d 1202, 1207 (8th Cir.

2013) (objective-standard-of-reasonableness prong); *Becht v. United States*, 403 F.3d 541, 549

(8th Cir. 2005) (prejudice prong).   "'Failure to establish either *Strickland* prong is fatal to an

ineffective-assistance claim.'"  *United States v. Kehoe*, 712 F.3d 1251, 1253 (8th Cir. 2013)

(quoting *Worthington v. Roper*, 631 F.3d 487, 498 (8th Cir. 2011)).

As a habeas petitioner proceeding under § 2254, Bahtuoh's task is harder still.  "If a state

court has already rejected an ineffective-assistance claim, a federal court may grant habeas relief

if the decision was 'contrary to, or involved an unreasonable application of, clearly established

Federal law, as determined by the Supreme Court of the United States.'"  *Yarborough v. Gentry*,

540 U.S. 1, 5 (2003) (quoting 28 U.S.C. § 2254(d)(1)).  Bahtuoh must show not only that he was

denied effective assistance of counsel, but that the Minnesota Supreme Court's ruling on his

ineffective-assistance claim was an error "beyond any possibility for fairminded disagreement."

*Harrington*, 562 U.S. at 103.  This standard is, and was meant to be, difficult to meet.  *See*

*Burt v. Titlow*, 134 S. Ct. 10, 16 (2013).

In deciding Bahtuoh's ineffective-assistance claim, the Minnesota Supreme Court

focused on two discrete events: (1) counsel's decision to tell the jury that Bahtuoh would testify;

and (2) counsel's later advice that Bahtuoh not testify.  *See Bahtuoh*, 840 N.W.2d at 816-18.

With respect to the first event,

> Bahtuoh has not identified any credible evidence indicating that,
> when defense counsel made his opening statement, he knew or
> should have known that Bahtuoh was unlikely to testify.  Rather,
> the record suggests that, when defense counsel made his opening
> statement, defense counsel reasonably expected that Bahtuoh
> would testify.  Because Bahtuoh had previously waived his right
> to remain silent and spoken both to the police and to the grand jury,
> and in fact intended to testify at trial, it was reasonable for defense
> counsel to believe, at the time of his opening statement, that
> Bahtuoh would testify.

> Had Bahtuoh taken the stand, defense counsel's representations in
> his opening statement would not have prejudiced Bahtuoh and may
> well have benefited him by explaining to the jury how Bahtuoh's

testimony would fit into the defense theory of the case.   It is only in hindsight, with the knowledge that Bahtuoh did not testify, that defense counsel's representations in his opening statement appear imprudent.   But we have cautioned against relying on hindsight when reviewing decisions made by trial counsel.   Although defense counsel took a risk when he told the jury in his opening statement that Bahtuoh would testify — a risk that hindsight shows was unwise — making that representation was not objectively unreasonable at the time.

*Id*. at 817 (citation omitted).   It does not appear that Bahtuoh challenges this aspect of the

Minnesota Supreme Court's decision; everyone seems to agree that defense counsel's strategic

decision to tell the jury during the opening statement that Bahtuoh would testify, viewed from the

vantage point of the attorney at the time he gave the opening statement, did not itself fall below

an objective standard of reasonableness.

Bahtuoh instead focuses his claim on the second event: defense counsel's subsequent

advice that Bahtuoh not testify.   The Minnesota Supreme Court, citing trial counsel's

explanation during closing arguments for Bahtuoh's failure to testify, concluded that "the record

establishes that trial counsel weighed the risks of Bahtuoh testifying against the risks associated

with failing to fulfill the representations that he made to the jury during his opening statement.

And trial counsel weighed those risks in light of new information — the strength of the State's

case — that he did not know at the beginning of trial."   *Id*.   Those particular facts appear to be

undisputed — that is, everyone agrees defense counsel thought about whether Bahtuoh should

testify (defense counsel was not oblivious to the fact that there was a decision to make), and

defense counsel concluded that Bahtuoh should not testify due to what he perceived as fatal infirmities in the government's case.[10]

This is where the disputes begin.   To start, in finding that defense counsel's performance did not fall below an objective standard of reasonableness, the Minnesota Supreme Court appears to rely *exclusively* on the facts that the defense counsel (1) considered the question of whether Bahtuoh should testify and (2) believed the state's case to be weak:

> Thus, the record establishes that trial counsel weighed the risks of Bahtuoh testifying against the risks associated with failing to fulfill the representations that he made to the jury during his opening statement.   And trial counsel weighed those risks in light of new information — the strength of the State's case — that he did not know at the beginning of trial.   *On these facts*, therefore, we cannot say that trial counsel's performance fell below an objective standard of reasonableness.

*Bahtuoh*, 840 N.W.2d at 817 (emphasis added).   If so, then there are at least three potential problems:

---

[10]There is one oddity worth mentioning: these factual findings were derived from statements made by defense counsel in the course of his closing argument.   He was not under oath, and closing statements generally may not be used as evidence.   Still, defense counsel's closing statement aligns with the testimony offered by Bahtuoh at the post-conviction hearing, and everyone — the Minnesota courts, the government, and Bahtuoh — has up to this point treated defense counsel's statements during closing argument as evidence of defense counsel's true rationale.   This Court will do the same.

First, the Minnesota Supreme Court suggested that once those facts were established,

defense counsel's decision was one based on trial strategy "'and therefore . . . not reviewable.'"

*Bahtuoh*, 840 N.W.2d at 818 n.3 (quoting *Andersen v. State*, 830 N.W.2d 1, 12 (Minn. 2013)).

"Some strategy decisions, however, are so unreasonable that they can support a claim of

ineffective assistance of counsel."   *United States v. Villalpando*, 259 F.3d 934, 939 (8th Cir.

2001) (collecting cases).   That a decision by defense counsel was *strategic* — i.e., that an

attorney understood he had a choice to make and in fact made a choice — does not, *by itself*, end

the ineffective-assistance inquiry.   The strategic decision must still be reasonable.[11]   Moreover,

---

[11]A reviewing court certainly should step lightly in reviewing decisions of trial strategy and take care to avoid the "natural tendency to speculate as to whether a different trial strategy might have been more successful."  *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).   But caution in evaluating a claim that a trial strategy was unreasonable is not the same thing as an altogether refusal to evaluate claims that a trial strategy was unreasonable.  *See Phoenix v. Matesanz*, 233 F.3d 77, 82 n.2 (1st Cir. 2000) (noting that "'*virtually* unchallengeable' does differ from 'unchallengeable.' . . . [T]he Supreme Court cited with approval the Court of Appeals approach to strategic decision-making, which had in fact allowed challenges when 'the choice was so patently unreasonable that no competent attorney would have made it.'" (quoting *Washington v. Strickland*, 693 F.2d 1243, 1254 (5th Cir. 1982))); *see also Carter v. Bigelow*, 787 F.3d 1269, 1290 (10th Cir. 2015) (finding that matters of trial strategy "cannot be the basis for a claim of ineffective assistance *unless* counsel's decision is shown to be so ill chosen that it permeates the entire trial with obvious unfairness." (quotation omitted; emphasis added)); *United States v. Cohen*, 427 F.3d 164, 170 (2d Cir. 2005) (noting that matters of trial strategy are "virtually unchallengeable *absent exceptional grounds for doing so*." (quotation omitted and emphasis added)); *Villalpando*, 269 F.3d at 939 ("Some strategy decisions, however, are so unreasonable that they can support a claim of ineffective assistance of counsel."); *Ward v. United States*, 995 F.2d 1317, 1318 (6th Cir. 1993).   The Supreme Court has never concluded that an attorney's objectively unreasonable strategic decisions are beyond review.   The few courts that have suggested strategic decisions of defense counsel are absolutely unreviewable are best understood as substituting the word "strategic" for "reasonable."   *See Bates v. Secretary, Florida Dep't of Corr.*, 768 F.3d 1278, 1298 (11th Cir. 2014) ("Our point is only that the answer is not obvious. Reasonable lawyers could disagree about the best way forward.").   To these courts, an "unreasonable strategy" is not a decision insulated from judicial scrutiny, but a contradiction in terms.   *See Chandler v. United States*, 218 F.3d 1305, 1314 (11th Cir. 2000) ("Thus, counsel cannot be adjudged incompetent for performing in a particular way in a case, as long as the approach taken 'might be considered sound trial strategy.'" (quoting *Darden v. Wainwright*, 477

(Footnote continued on following page)

the attorney's strategic decision must be *objectively* reasonable.   Whether defense counsel "sincerely," *Bahtuoh*, 840 N.W.2d at 818 n.3 — that is, *subjectively* — held what may have been an objectively unreasonable belief does not matter.   *See Harrington v. Richter*, 562 U.S. at 110 ("*Strickland* . . . calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind.").

Second, as explained above, the Minnesota Supreme Court found that defense counsel's decision was premised on the supposed weakness of the government's case.   But the Minnesota Supreme Court itself found elsewhere in its decision that "the State's case against Bahtuoh was strong."   *Bahtuoh*, 840 N.W.2d at 819.   Indeed, the Minnesota Supreme Court went still further, finding in relation to Bahtuoh's sufficiency-of-the-evidence claim that "there is *no rational hypothesis* in this case other than Bahtuoh's guilt . . . ."   *Id*. at 811 (emphasis added).   It is not easy to reconcile the conclusions that (1) under *no rational hypothesis* could the jury have done anything but find Bahtuoh guilty, and (2) defense counsel was objectively reasonable in concluding that the government had failed to prove its case.

---

(Footnote continued from previous page)
U.S. 168, 186 (1986))).   This may have also been the sense in which the Minnesota Supreme Court meant that defense counsel's strategic decision could not be reviewed.

Third, the Minnesota Supreme Court remarked that Bahtuoh had not provided "specific facts to support his claim that trial counsel's performance was deficient . . . ."   *Bahtuoh*, 840 N.W.2d at 817.   It is not entirely clear what the Minnesota Supreme Court meant by the comment, but Bahtuoh buttressed his ineffective-assistance claim with several specific factual contentions that, at a minimum, cast doubt upon the reasonableness of counsel's decision.   Most obviously, defense counsel's advice not to testify was given despite defense counsel having repeatedly and unwaveringly insisted during his opening statement that Bahtuoh would testify. *See* Tr. 892-97.   Bahtuoh also alleged that the failure to testify left substantial gaps in the theory of defense regarding lack of intent.   *Id*. at 896.   Read in the most charitable light possible, the Minnesota Supreme Court found that even accepting these particular "specific facts" as true,[12] defense counsel did not act unreasonably under the circumstances of this case in advising Bahtuoh not to testify.

The critical question in these habeas proceedings is whether the Minnesota Supreme Court's conclusion "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."   28 U.S.C. § 2254(d)(1).   Bahtuoh concedes that no Supreme Court decision is directly on point, but he argues that the Minnesota Supreme Court's rejection of his ineffective-assistance claim amounts to an unreasonable application of *Strickland*.   *See* ECF No. 21 at 15-16.   "'[T]o the extent that inferior federal courts have decided factually similar cases, reference to those decisions is appropriate in assessing the reasonableness *vel non* of the state court's treatment of

---

[12]With one important exception: The trial court explicitly found that defense counsel at least provided advice to Bahtuoh about whether to testify.   Above, this Court determined that this factual finding was not an unreasonable determination in light of the evidence presented in state court.

the contested issue . . . such reference is particularly appropriate in ineffective assistance of counsel cases, which are highly fact-specific.'"   *Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003) (quoting *Yancey v. Hall*, 237 F. Supp. 2d 128, 133 (D. Mass. 2002)).

Much of the debate, both before the state courts and in these proceedings, has focused on comparisons between this case First Circuit's decision in *Ouber v. Guarino*, 293 F.3d 19 (1st Cir. 2002).   In *Ouber*, the First Circuit found that, under the "unique circumstances" of that case, *id*. at 20, defense counsel's advice to his client not to testify after earlier having told the jury that the defendant would testify was not only deficient performance, but that it was unreasonable for the state courts to conclude otherwise, *id*. at 32.

The government is at pains to point out that some of the "unique circumstances" of *Ouber* are not present here.   The *Ouber* defendant had gone to trial twice before on the same charge, had testified at both trials, and the jury hung both times.   *Id*. at 22.   During defense counsel's opening statement at the third trial, "the lawyer promised — not once, but four times — that the petitioner would testify.   In the bargain, the lawyer emphasized the importance of this testimony. He pointed out that the case revolved around the petitioner's knowledge (or lack of knowledge) . . . ."   *Id*.   The third trial then proceeded exactly as the other two had.   In preparation for his client's testimony and likely impeachment upon cross-examination, defense counsel "paraded a large number of character witnesses before the jury, including an Eastern Orthodox bishop and several priests from the petitioner's community" to attest "to the petitioner's good character and reputation for veracity."   *Id*. at 23.

Despite all that, defense counsel advised the petitioner not to testify, and the petitioner followed the advice.   This time the jury found the petitioner guilty.   The federal district court

granted the petitioner's request for habeas corpus relief on the basis of ineffective assistance of counsel, and the First Circuit affirmed.   *Id.* at 36.

The Minnesota Supreme Court, like the government, stressed the ways in which *Ouber* differed from this case.

> First, trial counsel in this case did not build the entire defense around Bahtuoh's testimony.   To be sure, trial counsel's representations to the jury in this case are similar to the representations made by defense counsel during the opening statement in *Ouber*.   However, in *Ouber*, defense counsel made the defendant's trial testimony the central focus of the case when he called 24 character witnesses to testify about the defendant's reputation for veracity.   Nothing similar occurred here.

> Second, this case does not have a lengthy procedural history involving multiple trials.   As *Ouber* explains, a decision to advise the defendant not to testify, even after trial counsel promised the jury that he would testify, might be reasonable if counsel made such a decision in response to "unexpected developments" at trial. However, in *Ouber*, the trial proceeded as anticipated, and the "situation that confronted the attorney when he changed his mind about the desirability of presenting the [defendant's] testimony was no different from the situation that existed at a comparable stage of the earlier trials."   In this case, by contrast, trial counsel reached the conclusion that the State had failed to prove its case and, unlike in *Ouber*, trial counsel had no way to know how the jury would react to Bahtuoh's testimony.   And, in contrast to *Ouber*, we have no reason in this case to doubt the sincerity of trial counsel's view that developments at trial dictated his change of approach.   *Ouber*, therefore, has limited persuasive value here.

*Bahtuoh*, 840 N.W.2d at 818 (quoting *Ouber*, 293 F.3d at 29) (citations omitted).

The facts of this case are not quite as extraordinary as in *Ouber*.   No bishops were called to testify about Bahtuoh's credibility, and Bahtuoh's attorney was not acting with the knowledge that two previous trials had ended, if not entirely satisfactorily for his client, at least more favorably than with a finding of guilt.   But the differences between this case and *Ouber* are not

as stark as the government contends.   First, *Ouber* contains expansive language about the

unreasonableness of advising a client not to testify after telling the jury otherwise — language

that sweeps far beyond the "unique circumstances" of that case.   *See Ouber*, 293 F.3d at 28 ("It

is easy to imagine that, on the eve of trial, a thoughtful lawyer may remain unsure as to whether

to call the defendant as a witness.   If such uncertainty exists, however, it is an abecedarian

principle that the lawyer must exercise some degree of circumspection.").   Second, as in *Ouber*,

defense counsel left no wiggle room in his representations to the jury that Bahtuoh would testify.

*See id.* ("The petitioner's counsel elected to make his opening statement at the earliest possible

time.   He did not hedge his bets, but, rather, acted as if he had no doubt about whether his client

should testify.").   Third, defense counsel not only stated that Bahtuoh would testify, but stressed

the importance of that testimony — he went so far as to conclude his opening statement with a

plea to "[w]ait until he takes the stand and tells you what happened (Tr. 32) — and he further

suggested that vital evidence would be introduced through that testimony.   *Compare* Tr. 26

("Mr. Bahtuoh will tell you . . . why [he] had a good reason to believe that Lamont McGee was

not armed that day") *with Ouber*, 293 F.3d at 28 ("In the course of his opening statement, he

promised, over and over, that the petitioner would testify and exhorted the jurors to draw their

ultimate conclusions based on her credibility.").   Fourth, in each case, defense counsel's

stratagem rested upon a premise that crumbles under stress.   In *Ouber*, defense counsel's

explanation that he feared what would happen upon cross-examination of his client failed

because he should have known what would happen upon cross-examination, as his client had

been cross-examined twice before in practically identical trials.   In this case, defense counsel's

explanation that the state had failed to prove guilt and that testimony was therefore unnecessary

is undermined by the Minnesota Supreme Court's finding that "there is no rational hypothesis in this case other than Bahtuoh's guilt . . . ." *Bahtuoh*, 840 N.W.2d at 811.   This case does not match *Ouber* precisely, but it is far closer than the government suggests.

Moreover, the facts of this case do not need to be as extreme as those in *Ouber* to support a finding of ineffective assistance.   *Ouber* is not the only case in which a federal court proceeding under AEDPA has concluded, despite denial of the claim by the state courts, that an attorney provided ineffective assistance by telling the jury that the defendant would testify, then breaking that promise.  *See Madrigal v. Yates*, 662 F. Supp. 2d 1162, 1184-85 (C.D. Cal. 2009); *cf. Williams v. Woodford*, 859 F. Supp. 2d 1154, 1170-72 (E.D. Cal. 2012) (J. Kozinski, finding deficient performance under *Strickland* in part based on broken promise during the opening statement that the defendant would testify and provisionally granting habeas petition).   Indeed, federal circuit courts have found deficient performance where defense counsel promises the testimony of witnesses *other* than the defendant.   *See Harris v. Reed*, 894 F.2d 871, 878-79 (7th Cir. 1990); *Anderson v. Butler*, 858 F.2d 16, 18-19 (1st Cir. 1989).

Conversely, though, there is no bright-line rule that breaking a promise to the jury that the defendant will testify constitutes deficient performance.   For example, in *Washington v. State*, 989 A.2d 94 (R.I. 2010), the Supreme Court of Rhode Island concluded that defense counsel was not constitutionally deficient where the testimony of defendant was intended to be used only "to inform the jurors of his remorse and state of mind," *id*. at 102, and other evidence (including the defendant's confession) provided the same information to the jury.   Other courts, including the Eighth Circuit, have found that attorneys have wide latitude in changing course after promising

to the jury that certain witnesses other than the defendant will testify.   *See Williams*, 340 F.3d at 671-72 (collecting cases).

This is something of a corner case.   It does not include every one of the unusual circumstances of *Ouber* — the three trials and divine character witnesses and a defense theory built entirely around the veracity of the defendant — or the pre-AEDPA standard of review of some of the decisions cited above finding ineffective assistance.   At the same time, the case for objective unreasonableness is stronger where, as here, the broken promise concerns the testimony of the defendant himself, not other witnesses.   That this case falls between the cracks suggests that fairminded jurists could conclude Bahtuoh's attorney acted reasonably under the circumstances, thereby precluding habeas relief.

There is a second prong to *Strickland*, though, and that prong weighs more decisively in favor of the government.   However unreasonable his defense counsel's advice might have been, Bahtuoh must still show that there is a reasonable probability the result of his trial would have been different if he had testified.   Because the Minnesota Supreme Court declined to address the issue of prejudice, *see Bahtuoh*, 840 N.W.2d at 818 n.4, this Court will review de novo whether Bahtuoh was prejudiced by his counsel's actions, *see Rompilla v. Beard*, 545 U.S. 374, 390 (2005).

Bahtuoh is caught in a dilemma.   The stronger the case made against him by the government at trial, the less reasonable his attorney's advice not to testify becomes, as that advice was premised on the weakness of the government's case.   But if the government's case against Bahtuoh at trial was so strong that it was objectively unreasonable to advise Bahtuoh not to testify — and, what's more, if the case against Bahtuoh was so strong that no fairminded jurist

could have concluded that this "virtually unchallengeable" trial strategy was objectively reasonable, *Phoenix v. Matesanz*, 233 F.3d 77, 82 (1st Cir. 2000) — then Bahtuoh will have a mountain to climb in showing prejudice.

This Court finds that Bahtuoh has not shown there was a reasonable probability the result of his trial would have been different if not for his attorney's advice.   To begin, this Court agrees with the Minnesota Supreme Court that "the State's case against Bahtuoh was strong." *Bahtuoh*, 840 N.W.2d at 819.   The only real issue at Bahtuoh's trial was the extent to which Bahtuoh intended the commission of Kyle Parker's murder.   As explored more fully below in discussing Bahtuoh's claim regarding the sufficiency of the evidence, the circumstances proved at trial amply showed that Bahtuoh intended to aid in the commission of the offense.[13]

Next, a defendant testifying is never without dangers, as Bahtuoh's attorney acknowledged during the closing argument.   *See* Tr. 727-28 ("Because when you start doing that, you may start weighing, well, we don't like his mannerisms, we don't like him.   We don't like the way he sat in the chair.").   Bahtuoh had changed his story before, first when talking to the police, and then while testifying before the grand jury.   *Bahtuoh*, 840 N.W.2d at 808.   The risk of impeachment was high.   When Bahtuoh later took the stand regarding his claim that he did not knowingly and voluntarily waive his right to testify, the trial court found that was not a credible witness on his own behalf and discounted his testimony entirely.   *See id*. at 815-16. The jury may have done the same.

---

[13]The evidence of intent was so strong that the jury was able to find Bahtuoh guilty even through it was required to find a *more* culpable state of mind than the Minnesota accomplice-liability statute requires.   *See* Section II.B.3 *infra*.

The risks of impeachment and being discredited before the jury would have been especially dangerous for Bahtuoh, as his attorney was not *completely* wrong that the case had been won.   The jury acquitted Bahtuoh on two counts of aiding and abetting premeditated murder.   If convicted of that offense, Bahtuoh would have been subject to a mandatory sentence of life imprisonment *without* possibility of parole.   *See* Minn. Stat. § 609.106, subd. 2(1); *State v. McDaniel*, 777 N.W.2d 739, 753 (Minn. 2010).   The sentence Bahtuoh received was harsh — life imprisonment with possibility of release after 31 years, *see Bahtuoh*, 840 N.W.2d at 808 — but it could have been harsher still.   Bahtuoh's testimony might have completely sealed his fate inside prison for the rest of his life, especially if the jury found him an unveracious witness upon cross-examination.

On the other side of the ledger, it is possible that the unfulfilled promise of Bahtuoh's testimony tainted the jurors' views about the strength of the defense.   This Court believes that the effect of the broken promise in this case was minimal, though.   Bahtuoh's attorney faced the issue head-on in his closing argument, explaining to the jury that he had erred by saying Bahtuoh would testify and providing an explanation for Bahtuoh's choice not to take the stand.   *See* Tr. 727-28.   The jury was expressly instructed by the trial court that it should not draw any inference from the fact that Bahtuoh did not testify.   *See* Tr. 660.   And again, the fact that the jury acquitted Bahtuoh of two of the six offenses suggests that their view of the defense was not irrevocably poisoned by the opening statement.

Finally, Bahtuoh argues that critical evidence about his intent — specifically, that he and Parker were not enemies; that he attended college with Parker; that he did not know McGee very well; and that he had a good reason to believe McGee was unarmed on the day of the murder —

could only have come in through his testimony.   But the jury was made aware of some of that

evidence through the testimony presented.   Bahtuoh told the grand jury (in testimony read at trial

by the court reporter) that he was at least on speaking terms with Parker, that he went to school

with and knew "for a long time" many members of the gang to which Parker allegedly belonged,

and that he did not know Lamont McGee's surname at the time of the murder.   *See* Tr. 557-60,

563.   Under the Minnesota accomplice-liability statute, "[j]urors can infer the necessary intent

from factors including: 'defendant's presence at the scene of the crime, defendant's close

association with the principal before and after the crime, defendant's lack of objection or surprise

under the circumstances, and defendant's flight from the scene of the crime with the principal.'"

*State v. Swanson*, 707 N.W.2d 645, 659 (Minn. 2006) (quoting *State v. Pierson*, 530 N.W.2d

784, 788 (Minn. 1995)).   Even if Bahtuoh were given the opportunity to testify to all of the

things that he believes the jury did not get a chance to hear, the jury nevertheless would have

been able to infer the necessary intent from all of those factors.   Bahtuoh was undisputedly in his

car alongside McGee at the time of the murder; he testified before the grand jury (in testimony

proffered to the petit jury) that he had known McGee for several years, *see* Tr. 560; Bahtuoh has

never suggested that he objected to or expressed surprise at the killing in the immediate

aftermath; and he immediately fled the scene with McGee after the shooting and offered no

assistance whatsoever to Parker.   At *best*, Bahtuoh's purported testimony would have scratched

some paint from the state's case regarding intent; it would not have destroyed it.   And at worst,

Bahtuoh's testimony might have established his premeditation in the minds of the jurors and

entombed him forever inside a penitentiary.   Because Bahtuoh has not established that he was

prejudiced by his attorney's advice not to testify, this Court concludes that the claim should be denied.

### 3.   Jury Instruction on Accomplice Liability

The jury found Bahtuoh guilty of first-degree felony murder on the theory that he aided and abetted Lamont McGee's killing of Kyle Parker.   Bahtuoh argues that under the instructions given by the trial court, the jury was not required to find beyond a reasonable doubt that he intended his presence or actions to further the commission of McGee's crime, as required by Minnesota law.   In other words, Bahtuoh alleges that the jury instructions were erroneous and prejudicial, and he seeks a new trial as a result.

"Generally, issues relating to jury instructions in state-court proceedings involve the application and interpretation of state law."   *Liggins v. Burger*, 422 F.3d 642, 651 (8th Cir. 2005) (quotation omitted).   This case is no exception; Bahtuoh's contention is that the trial court misstated Minnesota law on accomplice liability.   But "the fact that [an] instruction was allegedly incorrect under state law is not a basis for habeas relief."   *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991) (citing *Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1983)).   Instead, the petitioner must show that the "erroneous jury instruction constituted 'a fundamental defect' that resulted 'in a complete miscarriage of justice, [or] an omission inconsistent with rudimentary demands of a fair trial.'"   *Louisell v. Director of Iowa Dep't of Corr.*, 178 F.3d 1019, 1022 (8th Cir. 1999) (quoting *Crump v. Caspari*, 116 F.3d 326, 327 (8th Cir. 1997) and *Hill v. United States*, 368 U.S. 424, 428 (1962)).

Although the jury instructions contested by Bahtuoh were erroneous as a matter of state law (as found by the Minnesota Supreme Court), those instructions did not come close to

constituting a fundamental defect in the proceedings or an omission inconsistent with the rudimentary demands of a fair trial.   In fact, far from being a grave defect in the proceedings, the erroneous jury instructions required the jury to find that Bahtuoh had a *more culpable* state of mind than Minnesota law demands of an aider or abetter.   Bahtuoh therefore cannot succeed on a habeas claim grounded in the jury instructions at issue.

Minnesota law provides that "[a] person is criminally liable for a crime committed by another if the person intentionally aids, advises, hires, counsels, or conspires with or otherwise procures the other to commit the crime."   Minn. Stat. § 609.05, subd. 1.   The Minnesota Supreme Court has interpreted "the element of 'intentionally aiding' [as embodying] two important and necessary principles: (1) that the defendant 'knew that his alleged accomplices were going to commit a crime,' and (2) that the defendant 'intended his presence or actions to further the commission of that crime.'"   *State v. Milton*, 821 N.W.2d 789, 805 (Minn. 2012) (quoting *State v. Mahkuk*, 736 N.W.2d 675, 682 (Minn. 2007)).

As relevant to Bahtuoh's claim, the trial court instructed the jury on accomplice liability as follows:

> Under Minnesota law, a defendant can be held liable for a crime even though another person actually committed the criminal acts, provided the defendant intentionally aided, advised, hired, counseled, conspired with or otherwise procured the other person to commit the crime.   This is called aiding and abetting.   This concept applies to all of the six counts that are being submitted to you for decision. . . .
>
> Mere presence at the scene of a crime without more is not enough for you to impose liability under the aiding and abetting law.   Such a person is merely a witness.   *However, a person's presence can constitute aiding and abetting if it is done intentionally and if it also aids or encourages the commission of the crime to any degree.*

*Bahtuoh*, 840 N.W.2d at 812 (quoting Tr. 665) (emphasis added).

Bahtuoh argued on appeal, and the Minnesota Supreme Court agreed, that the italicized language above was a misstatement of Minnesota law.   *Id*. at 812-13.   The instruction conflated intentional presence at the scene of a crime with intent to actually further the commission of a crime.   In another case, the Minnesota Supreme Court remarked that a similar instruction was erroneous "because it 'relieved the state of its burden to prove that [the defendant] intended his presence to further the commission of the crime.'" *Id*. at 812 (quoting *Mahkuk*, 736 N.W.2d at 683).

But in this case, the potentially harmful instruction quoted above was counterbalanced by the jury instructions explaining the elements of the individual counts on which Bahtuoh was charged.   For example, on the count for which Bahtuoh was sentenced, the instruction required the jury to find that Bahtuoh, "acting alone or intentionally aiding and abetting another, acted with the intent to kill Kyle Parker" and that "[t]o find the defendant had an intent to kill, you must find that the defendant acted with the purpose of causing death or believed that the act would have that result . . . ."   *Id*. at 814 (quoting Tr. 672).   This instruction, too, was erroneous, but it was erroneous because "the jury was required to find that Bahtuoh had a *more* culpable state of mind than is required for accomplice liability under Minnesota law."   *Id*.   "Rather than requiring knowledge that McGee was going to commit a crime, as Minnesota law currently requires, the instruction required the jury to find that Bahtuoh *himself* 'acted with the intent to kill Kyle Parker,' regardless of whether it found that Bahtuoh acted as an accomplice or as a principal."   *Id*.

Thus, under the instructions provided by the trial court, the jury necessarily found that Bahtouh acted with the required intent to be an accomplice in the murder of Kyle Parker.   The jury instructions may have deviated from best practices under state law, *see Bahtuoh*, 840 N.W.2d at 815 n.1, but the error, far from being a complete miscarriage of justice, was ultimately to Bahtuoh's benefit; the prosecution was required under the jury instructions as a whole to prove more than Minnesota law required.[14]

Bahtuoh's claim for habeas relief based upon the erroneous jury instructions is without merit.   It should be denied.

### 4.   Ineffective Assistance of Counsel — Jury Instruction

Closely related to the claim that the erroneous jury instructions were unduly prejudicial is Bahtuoh's argument that defense counsel provided ineffective assistance by failing to object to the erroneous jury instructions.   To prevail on a claim of ineffective assistance of counsel, Bahtuoh must show that he was prejudiced by his counsel's performance.   *See Strickland*, 466 U.S. at 694.   As just explained, the instructions provided by the trial court, although erroneous as a matter of state law, required the jury to find that Bahtuoh had *at least* the intent required by Minnesota law for accomplice liability.   Had the trial court corrected its errors upon an objection of defense counsel, the result would have been that the jury was given an instruction less favorable to Bahtuoh.   Thus, even if Bahtuoh could show that his counsel's failure to object to the (ultimately beneficial) jury instructions fell below an objective standard of reasonableness, he has not come close to showing that he was prejudiced by his counsel's failure to object.

---

[14]Further buttressing the conclusion that Bahtuoh was not prejudiced by the erroneous jury instructions is that defense counsel expressly flagged for the jury during his closing argument that "'[y]ou'll see the instruction, mere presence is not enough to convict." Tr. 754.

Bahtuoh's claim of ineffective assistance of counsel premised upon the failure of defense counsel to object to the erroneous jury instructions should be denied.

### 5.   Refusal to Declare Mistrial

While testifying before the grand jury, Bahtuoh discussed a shooting that occurred shortly prior to the murder of Kyle Parker.   The parties had agreed to redact all grand-jury testimony about this earlier incident, but one reference slipped through as the court reporter read the following from Bahtuoh's account: "I went to go use the bathroom, I washed my hands, and as I was coming back to the door, a car came around the corner and fired."   Tr. 551.   The prosecutor immediately asked to approach the bench, and after a brief off-the-record discussion, the court reporter continued reading the (now properly redacted) grand-jury testimony.   *Id*.   At the close of evidence for the day, Bahtuoh's attorney moved for a mistrial, although he acknowledged that "I expect the Court will deny that."   *Id*. at 602.   He was correct; the motion for a mistrial was denied.   Bahtouh argued before the Minnesota Supreme Court that the improperly admitted testimony was highly prejudicial and that the refusal to declare a mistrial violated his due process rights.   The Minnesota Supreme Court rejected Bahtuoh's claim on the grounds that the admitted testimony "resulted in only minimal, if any, prejudice."   *Bahtuoh*, 840 N.W.2d at 820. This Court agrees.

A "holding on a matter of state evidentiary law is not grounds for federal habeas relief unless it was so unfair as to constitute a denial of due process."   *Richardson v. Bowersox*, 188 F.3d 973, 981 (8th Cir. 1999) (citing *Mercer v. Armontrout*, 844 F.2d 582, 587 (8th Cir. 1988)). "To obtain habeas relief on a due process claim, the petitioner must show that the impropriety was so egregious that it 'fatally infected the proceedings and rendered [the] entire trial

fundamentally unfair.'"   *Smith v. Groose*, 205 F.3d 1045, 1049 (8th Cir. 2000) (quoting

*Young v. Bowersox*, 161 F.3d 1159, 1161 (8th Cir. 1998)).   Non-structural trial errors are

grounds for vacating a state-court conviction on habeas review only where the error had a

substantial and injurious effect or influence in determining the jury's verdict.   *See Brecht v.*

*Abrahamson*, 507 U.S. 619, 637-38 (1993).

The brief allusion to the other shooting — two words over the course of a four-day trial

— was hardly sufficient to render the entire proceedings unfair.[15]   In fact, the reference would

have been cryptic to anyone (including the jurors) who was not already aware that the prior

shooting had occurred.[16]   Moreover, the jury acquitted Bahtuoh on all charges of first-degree

premeditated murder, suggesting that they did not believe Bahtuoh had been motivated by the

prior incident — if they were aware at all that the prior incident took place at all, which is

doubtful.   *See Bahtuoh*, 840 N.W.2d at 820.   The likelihood that Bahtuoh was prejudiced by his

erroneously admitted grand-jury testimony is infinitesimal.   This claim should be denied.

6.  Sufficiency of the Evidence

Finally, Bahtuoh argues that the evidence admitted at trial was insufficient for a rational

jury to convict on the crime of first-degree felony murder by participating in a drive-by shooting

for the benefit of a gang.   *See Jackson v. Virginia*, 443 U.S. 307, 324 (1979) ("[I]n a challenge to

a state criminal conviction brought under 28 U.S.C. § 2254 . . . the applicant is entitled to habeas

---

[15]Compare *Brecht*, 507 U.S. at 639 (finding no substantial and injurious effect where the government improperly referenced petitioner's post-*Miranda* warning silence over two pages of a 900-page trial transcript, and where evidence of guilt was otherwise compelling).

[16]Although the reference was not formally stricken from the record, the jurors did not have access to transcripts from the trial.   *See* Tr. 770.

corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt.").   Habeas claims based on the alleged insufficiency of the evidence introduced at trial "face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference."   *Coleman v. Johnson*, 132 S. Ct. 2060, 2062 (2012) (per curiam).   "First, on direct appeal, 'it is the responsibility of the jury — not the court — to decide what conclusions should be drawn from evidence admitted at trial.   A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury.'"   *Id*. (quoting *Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011) (per curiam)).   "And second, on habeas review, 'a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court.   The federal court instead may do so only if the state court decision was objectively unreasonable.'"   *Ibid*.

The Minnesota Supreme Court's finding that sufficient evidence supported the jury's guilty verdict was objectively reasonable.   Most of Bahtuoh's challenge to the sufficiency of the evidence concerns whether the government proved that he had the requisite intent to aid or abet the shooter in murdering Kyle Parker.   Under Minnesota law, "[a] defendant is guilty as an accomplice of an offense committed by another person if the defendant 'intentionally aids, advises, hires, counsels, or conspires with or otherwise procures [another person] to commit' the offense."   *Bahtuoh*, 840 N.W.2d at 810 (quoting Minn. Stat. § 609.05, subd. 1).   To show that a defendant "intentionally aid[ed]" another person to commit a crime, the government must show "two important and necessary principles: (1) that the defendant 'knew that his alleged accomplices were going to commit a crime,' and (2) that the defendant 'intended his presence or

actions to further the commission of that crime.'"   *Milton*, 821 N.W.2d at 805 (quoting *Mahkuk*,

736 N.W.2d at 682).

The Minnesota Supreme Court summarized the evidence supporting Bahtuoh's intent in

aiding McGee, the shooter, as follows:

> Bahtuoh and Parker were members of rival gangs that have a
> history of violent conflict.   In the 2 hours immediately preceding
> the shooting, at least 13 calls were made from Bahtuoh's cell
> phone to telephone numbers that were associated with other known
> members of his gang.   In the hours preceding the shooting,
> Bahtuoh drove his car from a known gang hangout to the location
> of the shooting at least three times.
>
> At the scene of the shooting, Bahtuoh drove and positioned the car
> so that McGee was close to Parker.   Bahtuoh then summoned
> Parker to the car.   As Parker approached the car, Parker's friend,
> A.M., asked him whether everything was "cool."   Parker said
> "yes" and told A.M. that Bahtuoh was a "nobody."   Bahtuoh saw
> McGee pull out a gun and point it at Parker.   Bahtuoh then saw
> McGee fire multiple close-range shots at Parker.   In the seconds
> before, during, and after the shooting, Bahtuoh kept the car
> stationary and did not object, express surprise, or otherwise attempt
> to stop McGee from shooting Parker.   Bahtuoh then fled the scene
> at high speed rather than attempting to assist Parker or call the
> authorities.
>
> Shortly after the shooting, Bahtuoh met with a member of his gang
> whom he had called immediately before the shooting.   In the hours
> that followed, at least three additional calls were made from
> Bahtuoh's cell phone to telephone numbers that were associated
> with known members of his gang.   Bahtuoh also moved his car to
> a remote location, removed identifying information from the car,
> placed his cell phone in the trunk of the car, and lied to his
> girlfriend's family when he asked them for a place to stay.   In
> addition, Bahtuoh lied to the police when he initially told them that
> he was not involved in Parker's shooting. . . .
>
> The circumstances proved lead to a number of reasonable
> inferences related to Bahtuoh's mental state.   Bahtuoh made three
> trips between a known gang hangout and the home where the
> shooting occurred in order to find Parker, a known member of a

-46-

rival gang.   When Bahtuoh eventually spotted Parker, Bahtuoh
turned the car to place McGee close to Parker.   Bahtuoh
summoned Parker to the car, and Parker — who apparently did not
feel threatened by Bahtuoh — obliged.   Bahtuoh did not interfere,
object, or otherwise attempt to stop McGee from shooting Parker
because McGee's actions did not surprise or upset Bahtuoh.
Bahtuoh fled rather than attempting to assist Parker or call the
authorities because he did not intend to assist Parker.   Bahtuoh
disposed of the evidence and lied to his girlfriend's family and the
police because he was aware of his guilt and sought to avoid arrest.
These reasonable inferences support the hypothesis that Bahtuoh
knew that McGee was going to commit a crime and intended his
presence and actions to further the commission of that crime.   We
therefore conclude that the circumstances proved are consistent
with Bahtuoh's guilt.

*Bahtuoh*, 840 N.W.2d at 810-11.   The jury had more than enough evidence from which to

deduce that Bahtuoh both knew that McGee was going to murder Kyle Parker and that Bahtuoh

intended to further the commission of the murder.

Bahtuoh does not argue that the Minnesota Supreme Court misstated the record regarding

the evidence lined up against him.   Instead, Bahtuoh mostly argues that *other* evidence

introduced at trial but not mentioned by the Minnesota Supreme Court — for example, testimony

from a witness at the crime scene who told police shortly after the murder that she did not

recognize Bahtuoh's car — tends to demonstrate his innocence.   *See* Pet'r Mem. at 29 [ECF

No. 6] (citing Tr. 234-40).   But a few loose evidentiary ends do not preclude a rational finder of

fact from finding guilt beyond a reasonable doubt.   The evidence Bahtuoh marshals in his favor

is, on the whole, weak and equivocal; for example, the witness whose testimony he cites in his

memorandum later told the grand jury that she *did* recognize Bahtuoh's car from the scene of the

crime.   *See* Tr. 234-40.   Her testimony at trial was more an expression of doubt concerning her

memory than an affirmative statement that the car had been nowhere near the scene of the

murder.   *Id.*   It would have been entirely reasonable for the jury, faced with the copious

evidence of guilt presented against Bahtuoh, to disregard the slivers of uncertain exculpatory

testimony offered by this hesitant and uncertain witness.

Just as importantly, this matter comes to the Court not on direct review, but on habeas

review.   The question of whether sufficient evidence was introduced to support Bahtuoh's

conviction is not a close call.   But even if it were a close call, the Minnesota Supreme Court's

conclusion about the sufficiency of the evidence is, at the very least, reasonable.   Bahtuoh's

sufficiency-of-the-evidence claim should be denied.[17]

## C.   Certificate of Appealability

A § 2254 habeas corpus petitioner cannot appeal an adverse ruling on his petition unless

he is granted a certificate of appealability ("COA").   *See* 28 U.S.C. § 2253(c)(1); Fed. R. App.

P. 22(b)(1).   A COA cannot be granted unless the petitioner "has made a substantial showing of

---

[17]Bahtuoh also complains that he should not have been found guilty of a crime when McGee, who according to the government actually pulled the fatal trigger, "is still out there living his life . . . ."   Pet'r Mem. at 30 [ECF No. 6].   This is, at heart, an argument about logical consistency, not sufficiency of the evidence, although it is presented by Bahtuoh as the latter.   *See Powell*, 469 U.S. at 63-65; *United States v. Suppenbach*, 1 F.3d 679, 681-82 (8th Cir. 1993) (distinguishing inconsistent-verdict claims from insufficiency-of-the-evidence claims).   This Court does not know whether McGee was prosecuted for murder or, if so, what the result of those proceedings was (Bahtuoh alleges that McGee was never charged with the crime).   But those questions are irrelevant to whether the evidence presented at *Bahtuoh*'s trial was sufficient for a rational jury to convict *Bahtuoh* of aiding and abetting first-degree felony murder.   As explained above, the jury rationally concluded that the evidence before it was sufficient to find Bahtuoh guilty, and the Minnesota Supreme Court was reasonable in finding that the jury acted rationally in that decision.   *See also* Minn. Stat. § 609.05, subd. 4 ("A person liable under this section may be charged with and convicted of the crime although the person who directly committed it has not been convicted . . . ."); *United States v. Brunson*, 657 F.2d 110, 114 (7th Cir. 1981) ("[T]here is no general rule of law that an aider cannot be convicted where the principal was not convicted.   In fact, an aider can be convicted even where the principal is acquitted . . . .").

the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make such a showing, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Five of Bahtuoh's six grounds for relief are garden-variety habeas claims upon which there has been no substantial showing of the denial of a constitutional right. One claim, however — that Bahtuoh was denied effective assistance of counsel when his attorney told the jury during his opening statement that Bahtuoh would testify and then later advised Bahtuoh not to testify — is sufficiently debatable that this Court therefore recommends that a certificate of appealability be issued on that question.

## RECOMMENDATION

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY RECOMMENDED THAT:

1. Petitioner Christopher Dineaa Bahtuoh's petition for a writ of habeas corpus [ECF No. 1] be DENIED.

2. A certificate of appealability be issued on the following question: Was the finding of the Minnesota Supreme Court that Bahtuoh's trial counsel's performance was not constitutionally deficient when he told the jury that Bahtuoh would testify but later advised Bahtuoh not to testify an unreasonable application of clearly established federal law or based on an unreasonable determination of the facts?

Dated: April 12, 2016              _____ s/ Jeffrey J. Keyes _____
                                        Jeffrey J. Keyes
                                        United States Magistrate Judge

## NOTICE

**Filing Objections:**   This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.   A party may respond to those objections within 14 days after being served a copy of the objections.   LR 72.2(b)(2).   All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:**   This Report and Recommendation will be considered under advisement 14 days from the date of its filing.   If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.